UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Ft. Pierce Division

**Case Number:  07-14122-CIV-MARTINEZ-LYNCH**

CITIZENS FOR SMART GROWTH, a Florida
Non Profit Corporation; ODIAS SMITH, an
individual; and KATIE SMITH; an individual,

      Plaintiffs,

vs.

MARY E. PETERS, Secretary, Department of
Transportation; J. RICHARD CAPKA,
Administrator, Federal Highway
Administration; DAVID C. GIBBS, P.E.,
Division Administrator, Federal Highway
Administration, Florida Division; and,
STEPHANIE C. KOPELOUSOS, Secretary,
Florida Department of Transportation,

      Defendants.

_____/

## ORDER GRANTING SUMMARY JUDGMENT AND DENYING INJUNCTION

      This action is before the court on Federal Defendants' Motion for Summary

Judgment **(D.E. 78)**, Plaintiffs' Motion for Summary Judgment **(D.E. 82)**, and Plaintiffs' Motion

for a Temporary Restraining Order and Preliminary Injunction **(D.E. 121)**. Plaintiffs are seeking

to enjoin the construction of the proposed and approved Indian Street Bridge Project in Martin

County, FL. This project recently received funding from the American Recovery and

Reinvestment Act, and is ready to begin initial construction pending the outcome of these

motions.  (Plaintiffs' Memorandum in Support of Motion for Temporary Restraining Order,

D.E. 122 at 2.)

      Plaintiffs allege that the Federal Highway Administration and the Florida Department of

Transportation violated the National Environmental Policy Act ("NEPA") and the Administrative

Procedure Act ("APA") by acting "arbitrarily, capriciously," "abusing agency discretion," or

otherwise acting "not in accordance with law" in the preparation of the required Final

Environmental Impact Statement ("FEIS") and the issuance of the final Record of Decision

("ROD") permitting construction of the Indian Street Bridge Project. (Plaintiffs' Amended

Complaint for Declaratory and Injunctive Relief , D.E. 69 at 14-15.)

Plaintiffs also allege that FHWA and FDOT violated the Department of Transportation

Act, Section 4(f), by not demonstrating that: 1) there is no prudent and feasible alternative to

using the section 4(f) land; and 2) that the project includes all possible planning to minimize

harm to the affected parklands. (Amended Complaint, D.E. 69 at 17, ¶ 45.)  Having considered

the Administrative Record and the filings of the parties, and being otherwise duly advised, the

Court determines that the Defendants are entitled to summary judgment.  The motion for a TRO

is, accordingly, moot.

## I.      Procedural and Factual Background

The proposed project, the Indian Street Bridge, is located in Martin County, FL. The

project and the proposed improvements total 4.26 miles in length, which commence at the

intersection of Florida's Turnpike and CR 714 (Martin Highway), continue along Martin

Highway and SW 36th Street, and connect with a four-lane Indian Street on the east side of the

St. Lucie River via a new four-lane bridge that crosses the river. (D.E. 83 at 6); (D.E. 80 at 6);

*see also* (FEIS Section 2.1 "Project Description," AR 7265.) The study area of the project is

bordered by Florida's Turnpike to the west, Federal Highway (SR 5/US 1) to the east, the I-95

crossing of the St. Lucie Canal to the south, and the Martin/St. Lucie County Line to the north.

The St. Lucie river runs through the study area. (FEIS Section 2.1, AR 7265.)

The parties agree that the Indian Street Bridge Project is a "major" federal action requiring the full Environmental Impact Statement as per NEPA. (Memo in Support of Defendant's Motion for Summary Judgment, D.E. 80 at 5.) The parties also agree that the Defendants are required to comply with any applicable requirements of Section 4(f). *Id*. Therefore, the remaining issues are whether the defendants met the statutory requirements of NEPA and Section 4(f) in the preparation of the Final Environmental Impact Statement ("FEIS") and the issuance of the Record of Decision ("ROD") that permitted the project to go ahead.

Martin County considered the need for an additional eastbound river crossing as far back as 1965; however, the genesis for the Indian Street Bridge Project  was the FDOT's April 1998 "Feasibility Study Report." (FEIS, Section 1.1.2 "Purpose and Need" at AR 7248.) This study was conducted at the behest of the Martin County Metropolitan Planning Organization ("MCMPO") "to investigate possible improvements to the State Road 714 corridor to satisfy future traffic demand." (Feasibility Study, AR 2–151 at AR 12.) The "Feasibility Study" did not consider alternative corridors besides the preexisting corridor at State Road 714, the Palm City Bridge, which is currently a four lane bridge, with two eastbound and two westbound lanes on parallel corridors. *Id*. at AR 12-13.  The alternatives considered included a No-Build Alternative, a Six-Lane Alternative, and an Eight-Lane Alternative.  *Id.* at AR 13.  At the end of the Feasibility Study, it was found that widening the existing bridge was not feasible due to concerns over the taking of Section 4(f) properties, *id.* at AR 12–13, concerns over the maximum noise standards, *id*. at AR 15, concerns over potential CERCLA (Superfund) sites along the corridor, *id.*, and concerns over the presence of an active bird breeding and nighttime rookery located at

the south side of the Palm City Bridge, *id*.  Furthermore, the Feasibility Study found that the

option which would achieve an acceptable Level of Service ("LOS") of "D" in design year 2026

was the eight-lane alternative, which was not a feasible option, as it did not comply with the

FDOT policy on maximum number of lanes on a State highway system funded by FDOT. *Id.* at

AR 13.[1]  While the Feasibility Study determined that the best alternative out of the three that

were studied was the No-Build Alternative, it was noted that the No-Build Alternative would not

be "a solution to the current and future traffic needs of this area." *Id.* at AR 17.  Therefore, the

study concluded that further alternatives should be evaluated, including an alternative bridge

crossing, to attempt to improve capacity without widening the Palm City Bridge.  *Id.*

Following the 1998 Feasibility Study**,** DOT prepared the New Bridge Crossing

Alternative Corridor Alignment Report, which was released in March 2001. ("Corridor

Alternatives Report," AR 370–580.)  This report examined seven different potential corridors for

a bridge crossing as well as a tunnel alternative.  *See* Corridor Alternatives Report, Appx. A, AR

581.  The potential alternative corridors were evaluated on a multi-factor matrix, which included

consideration of cost factors, traffic service factors, engineering factors, environmental factors

such as noise, air quality, wetlands impact, endangered species impact, and potential

contamination sites, and socio-economic factors such as public opinion, Section 4(f) impacts,

economic impacts, future development, sustainability, and community cohesion.  *Id.* at AR 578.

---

[1]Level of Service is a "qualitative measure of the operating conditions that occur on a given lane or roadway under various traffic volumes." (Feasibility Study Section 6.6, "Levels of Service," at AR 79.) The calculation of a Level of Service takes into account traffic volume, traffic speed, delay at intersections, and speed of free flow operation to "grade" the operating conditions of a roadway on a 6-level scale, where LOS "A" is the best (representing free flow of traffic) and LOS "F" is the worst. *Id.* Martin County set the minimum acceptable standard as an LOS "D" in the design year 2026. *Id.* at AR 80.

The Corridor Alternatives Report found that Corridor 3, the Indian Street Crossing, was the best overall option when balancing the various impacts of each potential crossing site. *Id*. The Feasibility Study and the Corridor Alternatives Report were later incorporated into the FEIS for the Indian Street Bridge Project. (FEIS, Section 2.2 Corridor Alternatives Evaluation at AR 7280–7324.)

Following the Corridor Alternatives Report and the recommendation of Corridor 3, extensive community outreach took place via a Community Assessment Task Team ("CATT") consisting of the District Community Liaison and engineers from the Office of Planning and Environmental Management. (FEIS, Section 6.3 Community Outreach at AR 7490.) The Draft Environmental Impact Statement ("DEIS") was distributed via mail to federal, state, and local agencies for notice and comment on September 25, 2003 and published in the Federal Register on October 3, 2003. (FEIS, Section 6.8 DEIS Coordination at AR 7520.) A long period of public and agency comment followed. These comments were responded to and incorporated into the FEIS, which was released on July 6, 2006. (FEIS Section 6 Comments and Coordination at AR 7467.) A Record of Decision approving the project was signed on October 19, 2006, incorporating comments and responses to the FEIS. (ROD at AR 10496, 10509–10520.)

The current suit was filed in federal district court for the Southern District of Florida on April 20, 2007. (D.E. 1.) Motions for summary judgment have been filed by both plaintiffs and defendants in this case. A hearing was held on October 1, 2009 regarding Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction. (D.E. 133.) As of February 9, 2010, the project had received funding from the American Reinvestment and Recovery Act, and a contract had been awarded to begin building pending the outcome of this suit. (D.E. 144.)

## II.    Standard of Review

Plaintiffs' claims are brought pursuant to the Administrative Procedures Act ("APA"),

which permits review of agency decisions to determine whether they are "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A).  "Under this

standard, . . . [this Court] give[s] deference to a final agency decision by reviewing for clear

error, and . . . [this Court] cannot substitute our own judgment for that of the agency." *Sierra*

*Club v. Johnson*, 436 F. 3d 1269, 1273 (11th Cir. 2006).  The Court must consider whether the

agency's decision "was based on a consideration of the relevant factors and whether there has

been a clear error of judgment."  *Id*. at 1273-74 (internal quotation marks and citations omitted);

*see also Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)

("Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors

which Congress has not intended it to consider, entirely failed to consider an important aspect of

the problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise.")

NEPA establishes procedures that agencies are required to follow before taking a "major"

action—defined as an action that "significantly affect[s] the quality of the human environment."

*Id.*; 42 U.S.C. § 4332(C).  However, NEPA only requires that an agency followed the prescribed

procedure; it does not mandate any particular result, and agencies are free to come to any

decision, including a decision that other values outweigh environmental costs, as long as the

adverse environmental effects are adequately identified and evaluated. *Sierra Club*, 526 F.3d at

1361.[2]  The Supreme Court  held that "[a] court can only find a federal agency's attempted NEPA compliance inadequate where it is arbitrary, capricious, or an abuse of discretion" in violation of the APA. *Sierra Club v. Flowers*, 526 F.3d 1353, 1361 (*citing Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 548 (1978)).  The only role of a reviewing court is to ensure that the agency took a "hard look" at the environmental consequences of a proposed action as required by NEPA. *Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin.*, 772 F.2d 700, 709 (11th Cir. 1985). The party challenging the agency action has the burden of showing by a preponderance of the evidence that the agency did not comply with the requirements of NEPA. *Id.* at 709 n. 9 (citing  *Sierra Club v. Callaway*, 499 F.2d 982, 992 (5th Cir.1974); *Environmental Defense Fund, Inc. v. Corps of Engineers*, 492 F.2d 1123, 1130-31 (5th Cir.1974)).

## II.    NEPA Analysis[3]

_____NEPA establishes procedures that agencies are required to follow before taking a "major" action—defined as an action that "significantly affect[s] the quality of the human environment." *Id.*; 42 U.S.C. § 4332(C).  However, NEPA only requires that an agency followed the prescribed procedure; it does not mandate any particular result, and agencies are free to come to any decision, including a decision that other values outweigh environmental costs, as long as the adverse environmental effects are adequately identified and evaluated. *Sierra Club*, 526 F.3d at

---

[2]The solely procedural nature of NEPA is well illustrated by an example the Eleventh Circuit used in *Sierra Club* to demonstrate the high level of agency discretion under NEPA . As long as the agency has evaluated the environmental issues, "it would not violate NEPA if the EIS noted that [the proposed action] would result in the permanent, irreversible destruction of the entire Florida Everglades, but [the agency] decided that the economic benefits outweighed the negative environmental impact." *Sierra Club*, 526 F.3d at 1361–1362.

[3] Where the analyses and the relevant portions of the record are the same, the Court has combined the discussion of some of Plaintiffs' claims under the same subheadings.

1361.[4]  The Supreme Court  held that "[a] court can only find a federal agency's attempted NEPA compliance inadequate where it is arbitrary, capricious, or an abuse of discretion" in violation of the APA. *Sierra Club v. Flowers*, 526 F.3d 1353, 1361 (*citing Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 548 (1978)).  The only role of a reviewing court is to ensure that the agency took a "hard look" at the environmental consequences of a proposed action as required by NEPA. *Druid Hills Civic Ass'n, Inc. v. Fed. Highway Admin.*, 772 F.2d 700, 709 (11th Cir. 1985). The party challenging the agency action has the burden of showing by a preponderance of the evidence that the agency did not comply with the requirements of NEPA. *Id.* at 709 n. 9 (citing  *Sierra Club v. Callaway*, 499 F.2d 982, 992 (5th Cir.1974); *Environmental Defense Fund, Inc. v. Corps of Engineers*, 492 F.2d 1123, 1130-31 (5th Cir.1974)).  Applying the appropriate standard of review, the Court finds that Plaintiffs have not showed that Defendants violated NEPA.

## A.      Purpose and Need Statement

The Plaintiffs' allegation that the FDOT and FHWA defined the purpose and need of the project impermissibly narrowly is not supported by the record under a deferential standard of review. The purpose of the NEPA study was defined as "to evaluate and comprehensively examine various alternatives for an additional crossing of the South Fork of the River in Martin County, Florida." (FEIS, Section 1.1.1, "Purpose and Need," AR 7247.) The agencies further

---

[4]The solely procedural nature of NEPA is well illustrated by an example the Eleventh Circuit used in *Sierra Club* to demonstrate the high level of agency discretion under NEPA . As long as the agency has evaluated the environmental issues, "it would not violate NEPA if the EIS noted that [the proposed action] would result in the permanent, irreversible destruction of the entire Florida Everglades, but [the agency] decided that the economic benefits outweighed the negative environmental impact." *Sierra Club*, 526 F.3d at 1361–1362.

clarified the purpose, stating that "[t]he primary focus of this study was to identify the location, type, and size of the crossing(s) that facilitates the improvement of the roadway network in Martin County," particularly those crossings that "accommodate infrastructure needs, transportation demand, multimodal interrelationships, social demands, emergency response and evacuation, and historical, current and planned growth." *Id*. The agency defined the "need" for the action as "predicated upon the necessity to improve capacity across the River in Martin County to accommodate infrastructure needs, transportation demand, multimodal interrelationships,[5] social demands, emergency response and evacuation, and historical, current, and planned growth." *Id.* at Section 1.2, "Need for the Action," AR 7250. FDOT referred to the April 1998 Feasibility Study as indicating the need for a total of eight lanes crossing the River, and found that the Indian Street Bridge would satisfy the need for additional traffic capacity across the River in accordance with the Martin County MPO's "2025 Long Range Transportation Plan." *Id.*

Plaintiffs allege that this "Purpose and Need" statement unlawfully narrows the potential alternatives to the point where the only alternative that would meet the purpose and need is the Indian Street Bridge Project. Plaintiffs claim that the need for the project to create eight lanes was impermissibly based on an invalid construction of the findings of the 1998 Feasibility Study, and that the Purpose and Need statement was tailored "in order to accommodate the Martin County MPO's December 2000 decision that endorsed Corridor 3 (the Indian Street Bridge) in the Corridor Report." (Plaintiffs' Memorandum in Support of Motion for Summary Judgment,

---

[5] In the context of the report, the terms "multimodal relationships" and "multimodal interrelationships" appear to refer to the flow of different forms of transportation, such as the creation of bicycle lanes or additional routes to the nearest airport.

D.E. 83 at 28.)  Plaintiffs thus allege that defendants impermissibly adopted a Purpose and Need statement that "led inexorably" to the alternative endorsed by the Martin County MPO, the Indian Street Bridge.  *Id.* at 29.  Plaintiffs assert that the purpose should have been stated in more general terms, such as by stating the purpose is to address traffic congestion and safety.

"The statement of a project's purpose and need is left to the agency's expertise and discretion, and we defer to the agency if the statement is reasonable." *Alliance for Legal Action v. FAA*, 69 Fed.Appx. 617, 622 (4th Cir. 2003) (citing *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1066-67 (9th Cir. 1998)).  "The reasonableness of a given statement of purpose and need depends first on the nature of the proposed federal action." *Id.*  Courts evaluate the reasonableness of an agency objective "with considerable deference to the agency's expertise and policy-making role." *City of Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999).  However, NEPA requires that agencies "may not define the objectives of an action in terms so unreasonably narrow that only one alternative from among the environmentally benign ones in the agency's power would accomplish the goals of the agency's action," making the EIS a "foreordained formality." *Citizens Against Burlington, Inc. v. Federal Aviation Administration*, 938 F.2d 190, 196 (D.C. Cir. 1990).  NEPA nevertheless does not require that agencies state the goals of the action in the broadest possible terms. *Id.*  Rather, "once an agency has considered the relevant factors, it must define goals for its action within the range of reasonable choices." *Id.* The agency's choice of a project's goals is, "like all agency decisions to which we owe deference, [reviewed] on the grounds that the agency itself has advanced." *Id.* (*citing SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Similarly, NEPA does not require that agencies disregard the needs and goals of the

parties applying for the agency action.  *Id.*  Rather, the agency should "take into account the

needs and goals of the parties involved in the application."  *Id.*  As the court wrote in *Citizens*

*Against Burlington:*

> An agency cannot redefine the goals of the proposal that arouses the call for action;
> it must evaluate alternative ways of achieving *its* goals, shaped by the application
> at issue and by the function that the agency plays in the decisional process. Congress
> did expect agencies to consider an applicant's wants when the agency formulates
> the goals of its own proposed action. Congress did not expect agencies to determine
> for the applicant what the goals of the applicant's proposal should be.

*Id.* at 200. Thus, the allegation that the agency was influenced by the decision of the Martin

County MPO, the applicant for the Indian Street Bridge Project, to endorse Corridor 3 is without

merit even if it is true, which Plaintiffs have not demonstrated on the record in this case.  Martin

County and the Martin County MPO have the right and the responsibility to try to determine the

long-term planning and transportation management goals for the county. Endorsement of a traffic

plan and sponsorship of that plan before FDOT and FHWA is in accordance with the

responsibilities of the MPO, an elected body that represents the people of Martin County. It is not

for this Court to step in and find that the goal of the Martin County Municipal Planning Office to

bring an additional four lanes of traffic capacity via a bridge to Palm City was an impermissible

or unwise goal. This Court only ensures that the agencies charged with helping to realize that

goal, FDOT and FHWA, have made an informed and well-considered decision. *See Vt. Yankee*,

435 U.S. at 558. While it is true that *"[s]omeone* has to define the purpose of an agency action,"

that someone should not be, and is not, the reviewing court.  *Citizens Against Burlington*, 938

F.2d at 199.

     For similar reasons,  the allegation that the "needs" cited to justify the project are invalid

or poorly documented cannot stand.  When defining the purpose and need of the project, the FDOT was well within its authority to consider the April 1998 Feasibility Study as indicative of the need for a total of eight lanes across the River. (FEIS, Section 1.2, Need for the Action, AR 7250.)  FDOT was not acting arbitrarily and capriciously when basing the need for the Indian Street Bridge on the Feasibility Study and the 2025 *Long Range Transportation Plan* of the Martin County MPO. FDOT considered the need for system linkage and transportation connectivity as one of the goals of the Martin County MPO under the Long Term Transportation Plan. *Id*. FDOT and FHWA considered and examined the existing roadway network (Section 1.2.1.1 at AR 7251), analyzed the origins and destination of traffic in the area (AR 7253), and considered the social demands of the area as well as the transportation demands (AR 7254).

Plaintiffs' objections to the "Purpose and Need" statement of the FEIS are essentially that the project was defined in such a way as to force the "need" for a four lane bridge across the river due to the impermissible influence of the Martin County MPO and the County's Transportation Plan. This allegation  reflects a "fundamental misapprehension of the role of federal and state agencies in the community planning process." *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1541 (11th Cir. 1990).  NEPA is intended to regulate the process of agency decision-making and ensure that the planning process considers environmental concerns. NEPA "does not confer the power or responsibility for long range local planning on federal or state agencies." *Id.* at 1541–1542. Rather, the relationship of FDOT and FHWA to the Martin County MPO should be one that is premised on the idea that the representatives of the community are best situated to make the decisions regarding transportation planning for their community, with FDOT and FHWA demonstrating the proper "respect for the sovereignty of local authorities." *Id.* Plaintiffs

allegations, namely that the Purpose and Need are improper due to the impact of the Martin County MPO's *Long Term Transportation Plan* and the goals of that plan, misconstrue the federal role.  The Purpose and Need statement in the FEIS is a permissibly broad statement of the goals of the project in accordance with the needs and desires of the community and its elected officials, and reject plaintiff's contention that the statement was impermissibly narrow. The Purpose and Need statement is valid, and documents the support for the proposed highway action as required by NEPA.

**B.      Narrowness of the Study Area**

Plaintiffs also allege that the study area chosen for the project was impermissibly narrow and therefore was not appropriate to adequately review the impacts of the project, or meet the actual purpose and need of the project. The claim that the study area of the FEIS was impermissibly narrow simply is not demonstrated by the record. The FDOT and FHWA considered the area of the Corridor Report, which considered seven different corridors located both north and south of the proposed Indian Street Bridge at Corridor 3and north and south of the existing Palm City Bridge. (AR 387-388.)  This selection of a study area was not arbitrary and capricious. Setting the parameters for a study area is well within an agency's discretion in preparing an FEIS as long as it allows for a study of the cumulative impacts and analysis of alternatives. *See Florida Wildlife Federation v. Goldschmidt*, 506 F. Supp. 350, 375 (S. D. Fla. 1981) ("An EIS is required only to furnish such information as appears to be reasonably necessary for the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well-nigh impossible."). The scope of this EIS was more than sufficient to provide the reasonably necessary information to evaluate the project.

C.      **Traffic Modeling**

_____Plaintiffs further allege that FDOT and FHWA acted arbitrarily and capriciously in the traffic and growth modeling used to determine the purpose and need for the project and to analyze the alternatives in the corridor report. This includes allegations that the traffic models used by the agencies was "inflated" and overestimated traffic in the area, and that the agencies used a "highly unorthodox and invalid procedure" for developing a "trip table," and that the agencies traffic models in the FEIS were exaggerated due to overestimated traffic volumes. (Memo in Support of Plaintiffs Motion for Summary Judgment, D.E. 83, 14 ¶37, 38.) Plaintiffs essentially allege that the entire methodology used in defendants' analysis of traffic impacts was improper. *Id*. at 16 ¶44, 48.

_____The basis for these allegations appears to be a comparison of the FDOT traffic modeling and analysis in the Feasibility Study and Corridor Analysis Reports with the traffic modeling prepared by the Plaintiffs expert, Smart Mobility, Inc., in preparation of the Citizens Alternative to the Indian Street Bridge Project (AR 6844–6877). Plaintiff's expert claims that the FDOT model overestimates the base year bridge volume, (AR 6847), that the number of bridge crossings were overestimates, (AR 6847), that FDOT used inappropriate extrapolations of traffic growth, (AR 6849), and that the factors exaggerating the future crossings were exaggerated, (AR 6849). Plaintiffs thus argue that, on the basis of their expert report, this Court should find that the models employed by FDOT were improper, arbitrary, and capricious.

However, "a judge may not call into question any reasonable agency methodologies used in arriving at its conclusion." *Florida Keys Citizens Coalition, Inc. v. United States Army Corps of Engineers*, 374 F. Supp. 2d 1116, 1144 (S.D. Fla. 2005); *see also Hughes River Watershed*

*Conservancy v. Johnson*, 165 F.3d 283, 289 (4th Cir. 1999) (stating that agencies are entitled to select their own methodology to comply with NEPA, as long as the methodology is reasonable). Rather, a district court should "properly recognize that it [cannot] designate itself a 'super professional transportation analyst' or decide which party utilized the better methodology." *Druid Hills*, 772 F.2d at 711.  "The district court simply determine[s] whether the [agency's] choice of methodology had a rational basis, consistently applied, taking relevant considerations into account."  *Id.*  There is no basis on the record to determine that this dispute is anything more than a battle of the experts between the FDOT's traffic analysts and those hired by the Plaintiffs. Technical disputes as to traffic modeling practice is exactly the sort of thing best left to the "super professional transportation analysts" at an agency, not to the district court.

The FDOT affirmed that the methodologies that the agency utilized were based on sound engineering principles, and that the travel demand forecasts represented the best available estimates of future travel.  (Analysis of Citizens Alternative, Section 2.1 Traffic Analysis at AR 6966.) The agency explained that the traffic modeling forecasts are not isolated, but are the cumulation of a series of studies representing future demand and land use in Martin County. *Id*. In addition, FDOT responded to each allegation of improper modeling presented in the Citizens Alternative.  *Id*. at AR 6967–6969. There does not appear to be any basis for this Court to find that these traffic models used by FDOT to determine the purpose and need were arbitrary or capricious. (FDOT Traffic Modeling found in FEIS, Section 1 Purpose and Need at AR 7250–7254.) Therefore, the allegations that FDOT and FHWA employed flawed growth models and flawed traffic models are without merit.

-15-

D.     **NEPA Alternatives Analysis**

Plaintiffs also claim that the decision to eliminate a tunnel crossing and combinations of two-lane corridors was unreasonable and unsupported, and that the decision to evaluate only variations on the Indian Street Bridge corridor, a Transportation System Management alternative, and the No-Build Alternative in the Final EIS was arbitrary and capricious.

These allegations are not supported by the record. The "New Bridge Crossing Alternative Corridor Alignment Report" ("Corridor Alternatives Report") evaluation prepared in March 2001 considered seven different potential corridors for a new crossing, including Corridor 3 at Indian Street. (Corridor Alternatives Report, AR 370–580, at AR380–381.)  In the Corridor Alternatives report, Corridor 3 scored the highest of all seven considered corridors in a Corridor Evaluation Matrix that included consideration of cost factors, traffic service factors, engineering factors, environmental factors such as noise, air quality, wetlands impact, endangered species impact, and potential contamination sites, and socio-economic factors such as public opinion, Section 4(f) impacts, economic impacts, future development, sustainability, and community cohesion.  *Id.* at AR 578; *see also* (FEIS, Section 2.2 Corridor Alternatives Evaluation at AR 7280–7324).  The Corridor Alternatives Report also evaluated the potential tunnel alternative in Appendix A to the Corridor Alternatives Report, the Tunnel Concept Report.  (Corridor Alternatives, Appendix A, Tunnel Concept Report, AR 581–604.)  The tunnel solution, while technically feasible and environmentally sound, was found to be prohibitively expensive.  *Id.* at AR 604, 605.  Since a bridge alternative was not technically non-feasible, the recommendation in the tunnel concept report was to use a bridge alternative, and the tunnel concept was dismissed after the requisite analysis and consideration.  *Id.*

-16-

The process of evaluating alternatives that took place here is well within an agency's discretion, and it follows the procedural requirement of NEPA that an agency take a "hard look" at the alternatives to a proposed action. *Druid Hills Civic Ass'n v. Federal Highway Administration*, 722 F.2d 700, 708 (11th Cir. 1985) (*citing Save Our Sycamore v. Metropolitan Atlanta Rapid Transit Authority*, 576 F.2d 573, 575 (5th Cir. 1978) (per curiam)).[6] The FDOT's decision that Corridor 3 was the best alternative for evaluation in the FEIS was supported by a detailed technical study that considered many different factors, which also fulfils the need for a "hard look" under NEPA.[7]

Defendants also conducted a concentrated study of combinations of alternatives and differences within segments of the corridor. As FDOT pointed out, the final corridor decision represented the selection of a preferred corridor from the seven separate corridors evaluated in

---

[6]In *Bonner v. Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[7]Despite the Plaintiffs' allegations, it is not improper for the agency to consider the preferences of Martin County, as expressed in the Martin County "2025 Long Range Transportation Plan," as a factor in the final determination of the site and design of the Indian Street Bridge Project in Corridor 3. For example, in *Citizens Against Burlington*, the court quoted extensively from the preface to the FEIS prepared by the FAA, which stated:

> When the Federal government acts, not as a proprietor, but to approve and support a project being sponsored by a local government or private applicant the Federal agency is necessarily more limited. In the latter instance, the Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project.

*Citizens Against Burlington*, 938 F.2d at 197. Furthermore, the influence of the Martin County MPO on the FDOT determination of alternatives was limited to the elimination of certain alternatives (like the Transportation Management Alternative), which did not conform to Martin County's long-term plan. The record shows that the Martin County MPO did not affirmatively select a plan.

-17-

the Corridor Report and included several alternatives for varying typical sections within the Corridor.  (Analysis of Citizen's Alternative Section 2.6, Response to Concerns, at AR 6975.) FDOT and FHWA coordinated with both the public and technical experts to allow for selected alternatives.  This evaluation of alternative corridor alignments also considered the social and economic consequences of various alternatives, the need for community cohesion, existing and future land use, archeological and historical resources, visual and aesthetic impacts, air quality, traffic noise, and the desire of the community for increased right of way, improved safety features, and pedestrian and bicycle facilities. (ROD, Alternatives Selected, at AR 10499–15000); (FEIS, Section 4 Environmental Consequences at AR 7343–7374).

"The procedural requirement that alternatives be considered is 'bounded by some notion of feasibility.'" *Druid Hills*, 772 F.2d at 713 (quoting *Vermont Yankee*, 435 U.S. at 551). "Common sense . . . teaches us that a detailed statement of alternatives cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man." *Id.* (quoting *Vt. Yankee*, 435 U.S. at 551).  Rather, "an EIS is satisfactory if the treatment of alternatives, when judged against a 'rule of reason,' is sufficient to permit a reasoned choice among the various options." *Id.*

The FDOT's consideration of the alternatives in the Corridor Alternatives Report meets this standard, as it was sufficient to permit a reasoned choice.  Furthermore, the segment alternatives selected by the FDOT in conjunction with the community permitted a choice that was both reasoned and supported by community desires and needs. (ROD, Alternatives Selected, at AR 10499–15000.) Thus, Plaintiffs' allegations that FHWA failed to fully evaluate "all reasonable, feasible, and prudent alternatives,"or that the agencies failed to evaluate

"combinations of alternatives or cumulative alternatives" is not sustained by the record.

**E.    Defendants' Review of the Citizen's Alternative**

The Plaintiffs' allegations that FDOT and FHWA violated NEPA and failed to fully

evaluate the Citizen's Alternative plan are also without merit. Plaintiffs' first claim is that, once

presented with the Citizen's Alternative, the Defendants had an obligation to review the

alternative in a Supplemental Environmental Impact Statement ("SEIS"). (Memo in Support of

Plaintiffs Motion for Summary Judgment, D. E. 83, 40.)  Plaintiffs therefore allege that the

analysis performed by FDOT in their Analysis of the Citizen's Alternative (AR 6955–7034) was

procedurally insufficient.  However, the FDOT's Final Analysis of the Citizens Alternative

demonstrates that, contrary to Plaintiffs' allegations, the FDOT gave ample consideration to the

Citizens Alternative, evaluating the Citizens Alternative using the same criteria that it used for

the other alternative corridors in the Corridor Alternatives Report. (Analysis of Citizens

Alternative at AR 6955–7034.)  Specifically, FDOT responded to each of the Plaintiffs'

allegations concerning flawed traffic modeling and overestimated projections.  (AR 6967–6969.)

FDOT examined whether the Citizen's Alternative would meet the Purpose and Need of the

project, and determined, not unreasonably, that the Citizens Alternative proposed a variation on

the Transportation System Management Alternative that had been already evaluated in the FEIS,

as it attempted to improve traffic flow via changes in intersections and modification of the

existing Palm City Bridge. (AR 6978.)  FDOT looked at the Citizens Alternative in terms of

social demands, emergency response needs, multimodal interrelationships, and social and

environmental impacts. (AR 6977–7034.)  FDOT prepared an independent traffic modeling

analysis for the Citizens Alternative, (Appx. D, AR 7112), drew models of typical sections and

concept construction plans, (Appx. E, AR 7124), and estimated the total cost of building the

Citizens Alternative, including costs to obtain the right-of-way, (Appx. F, AR 7131).  This

analysis was sufficient to demonstrate a reasonable basis for the agency's rejection of the

Citizens Alternative.

Nonetheless, Plaintiffs allege that the law would demand an SEIS for their proposal. This

overstates the law.  In order to require an SEIS, "new circumstances must present a *seriously*

different picture of the environmental impact of the proposed project from what was previously

envisioned." *Florida Keys Citizens Coalition, Inc. v. United States Army Corps of Engineers*,

374 F. Supp. 2d 1116, 1144 (S.D. Fla. 2005) (quoting *Sierra Club v. Froehlke*, 816 F.2d 205, 210

(5th Cir. 1987)) (emphasis in original). There is no basis for the allegation that the Citizen's

Alternative seriously changed the environmental impact of the proposed Indian Street corridor.

Indeed, the Citizen's Alternative appears to be more of a dispute regarding proper traffic

modeling than a document exposing major changes in the proposed project's environmental

impact. To the extent that the Citizen's Alternative is a variation on the Transportation

Management System Alternative, it had been evaluated as part of the preparation of the FEIS.

Indeed, requiring an SEIS for every conceivable alternative proposed after an EIS is complete

would "task agencies with a sisyphean feat of forever starting over in their environmental

evaluations, regardless of the usefulness of such efforts." *Florida Keys Citz. Coal., Inc.*, 374 F.

Supp. 2d. at 1145 (quoting *Price Road Neighborhood Ass'n, Inc. v. United States Dep't of

Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997)). There is no reason to task FDOT with a

reevaluation of their environmental assessment to account for one potential alternative,

particularly when the potential alternative has been fully examined and addressed.

-20-

Plaintiffs' next claim is that FDOT acted arbitrarily and capriciously in rejecting the Citizens Alternative, as the Citizens Alternative would "provide better traffic operations then the proposed Indian Street Bridge." (Memo in Support of Plaintiffs Motion for Summary Judgment, D.E. 83 at 41). This claim overstates Plaintiffs' case. Plaintiffs base this claim on the traffic models of their expert, Smart Mobility, Inc, which rated the Citizens Alternative at a Level of Service ("LOS") of B or higher for the intersections at issue in the corridor. (Citizens Alternative at AR 6860.) This LOS calculation appears to be based on a projected "design year" of 2009, and uses Smart Mobility's own methodology for determining traffic density and population growth. *Id.* These LOS ratings were then compared to the projected LOS of D for the "No-Build Alternative" in the FEIS for 2001 (representing current traffic), and with a projection based on a Martin County Congestion Management Study for 2009 with LOS ratings of F and D. *Id.* It appears that, in the analysis from their own expert, the Citizens Alternative outperformed the No-Build Alternative for 2009. *Id.* Plaintiffs extrapolate from these numbers that FDOT's refusal to implement their alternative demonstrates that the Purpose and Need of the project was not to improve traffic but was only to build a bridge. (D.E. 83 at 41.) However, to the extent that these numbers demonstrate anything, they appear to bolster Defendants' contention that the No-Build Alternative was not a viable option.

Furthermore, when performing their Analysis of the Citizens' Alternative, FDOT calculated the projected LOS for the intersections proposed by the Citizens' Alternative using FDOT methodology and growth projections and determined that nearly all of the intersections would have an overall LOS of F in the design year 2031, which was the design year used in the FEIS. (Analysis of the Citizens Alternative, Table 3-4 and 3-5 at AR 6988, 6990.) This traffic

analysis was explained by FDOT, and it was one of the reasons why the Citizen's Alternative

was not found to be a feasible alternative for the Indian Street Bridge.

It may be appropriate here to "reiterate that the court is not a 'super professional

transportation analyst charged with the duty of determining the propriety of competing

methodologies." *Druid Hills*, 772 F.2d at 711.  A review of the evidence, including the LOS

analysis in the Citizens Alternative (AR 6860) and the FDOT analysis and response (AR 6988),

demonstrates that the FDOT decision to reject the Citizens Alternative had a rational basis, was

based on reasonable computations, and was not arbitrary or capricious.  *See id.*  That is all that

NEPA requires, and all that the Court can decide. Therefore the allegation that FDOT failed to

fully evaluate an alternative plan should be rejected as without merit.

**F.**     **Defendants' Coordination with Other Agencies and the Public**

Defendants' coordination with other agencies and the participation and involvement of the

public was ample for the Indian Street Bridge Project.  The record reflects that FDOT and

FHWA coordinated with and received comments from the Florida Department of Environmental

Protection, the Florida Division of Historical Resources, SFWMD, the National Marine Fisheries

Service[8] and NOAA, Martin County and the Martin County MPO, the U.S. Department of

Housing and Urban Development, the U.S. Environmental Protection Agency, and many citizens'

groups, including Citizens for Smart Growth, who were invited to be part of the entire FEIS

---

[8]  Indeed, among Plaintiffs' specific allegations of NEPA violations, Plaintiffs asserted
that Defendants have not pointed to specific steps taken by them to minimize damage to
wetlands, as required by Executive Order 11990 and FHWA regulations.  The record, however,
shows that Defendants have done so, specifically by committing to following monitoring and
enforcement measures for the project requested by state and federal agencies, which will be
subject to review by the National Marine Fisheries Service.  (A.R. 10504.)

process. *See* (ROD, Summary of Comments and Responses at AR 10509–10521). FDOT received an Honorable Mention Environmental Excellence Award from FHWA for the transparency and public involvement that was part of this process, including public workshops, meetings with stakeholder groups, and a public hearing on November 6, 2003 with nearly 900 local property owners. (ROD, Response to Citizens for Smart Growth Comment on Public Participation, AR 10509); *see also* (FEIS, Section 6, Comments and Coordination, at AR 7467–7565).  FDOT went above and beyond the requirements of NEPA in attempting to ensure a transparent and participatory process for the Indian Street Bridge Project.  This Court is not free to intercede in that process simply because Plaintiffs, or even the Court, disagrees with the goal. *See Citizens Against Burlington*, 938 F.2d at 198–199. The goals of NEPA are to ensure that an agency considers every significant impact of a proposed action, and to ensure that the agency inform the public that it has considered environmental concerns. *Baltimore Gas & Electric Co. v. Natural Resources Defense Council*, 462 U.S. 87, 97 (1983). These aims were fully met.

## II.    Section 4(f) Analysis

The Supreme Court articulated the proper standard of review for alleged violations of the Department of Transportation Act, Section 4(f), in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971). In a Section 4(f) evaluation, "the [agency's] decision is entitled to a presumption of regularity, [but] that presumption does not 'shield [its] action from a thorough, probing, in-depth review.'" *Druid Hills*, 722 F.2d at 714 (*quoting Overton Park*, 401 U.S. at 415).  Unlike NEPA, which is a procedural statute, Section 4(f) places a substantive burden on the Secretary of Transportation to only approve a federally funded highway project if (1) no feasible and prudent alternative to the use of the land exists and (2) the project includes all

possible planning to minimize harm to the property. *Id.*   Courts use a three-part test in reviewing 4(f) actions.  A reviewing court must first consider whether the agency acted within the scope of its authority in approving the use of section 4(f) property, and determine if the agency could have reasonably believed that no "feasible and prudent alternatives" exist. *Id.* Next, the Court must determine if the ultimate decision was arbitrary, capricious, or an abuse of discretion. *Id.* This assessment requires an evaluation of whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Id.* (*citing Overton Park*, 401 U.S. at 416).  Finally, the Court is to determine whether the agency's decision followed the necessary procedural requirements. *Id.*[9]  Although the judicial inquiry should be "penetrating," the court "is not empowered to substitute its judgment for that of the agency." *Id.*

A.      **Defendants' Determination Regarding Feasible and Prudent Alternatives**

In *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971), the Supreme Court laid out a two part test for whether the Secretary acted within the scope of his or her authority in approving the use of section 4(f) lands for a highway project. The Secretary of the Department of Transportation can approve a federal highway project requiring the use of parklands or historic sites only if (1) no feasible and prudent alternative to the use of the land exists, and (2) the project includes all possible planning to minimize harm to the property. *Druid Hills*, 772 F.2d at 714; 49 U.S.C. § 303 (2008); 23 U.S.C. § 138 (2008).

An alternative is "feasible" if it can be built as a matter of sound engineering. *Druid Hills*,

---

[9] The Court notes that Plaintiff does not focus on this third factor.  The Court, therefore, will focus its analysis on the other two factors in the three-part test.

772 F.2d at 715 (*citing Overton Park*, 401 U.S. at 411). This very broad test is met by many alternatives, including the alternatives at issue here, such as the tunnel option or the Citizen's Alternative. An alternative is "prudent" unless there are "truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitude" or the alternative routes present unique problems. *Id.*

Regulations provide further guidance regarding when an alternative should be considered imprudent under *Overton Park*.[10]  The definition of "feasible and prudent" under the regulation is set forth as follows:

> Feasible and prudent alternative. (1) A feasible and prudent avoidance alternative avoids using Section 4(f) property and does not cause other severe problems of a magnitude that substantially outweighs the importance of protecting the Section 4(f) property. In assessing the importance of protecting the Section 4(f) property, it is appropriate to consider the relative value of the resource to the preservation purpose of the statute.
> (2) An alternative is not feasible if it cannot be built as a matter of sound engineering judgment.
> (3) An alternative is not prudent if:
> (i) It compromises the project to a degree that it is unreasonable to proceed with the project in light of the stated purpose and need;
> (ii) It results in unacceptable safety or operational problems;

---

[10] In a March 2005 Section 4(f) Policy Paper, FHWA issued a general statement for when an alternative would be rejected as "not prudent," which included a multi-factor balancing test. (FHWA Section 4(f) Policy Paper at AR 6747, 6755.)  Congress then passed a statute, the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for the Users (SAFETEA-LU), Pub. L. 109-59, 119 Stat. 1144 (2005), which directed the Secretary of Transportation to promulgate regulations clarifying the factors to be considered and the standards to be applied in determining whether an alternative to use of section 4(f) property is prudent and feasible.  *See* 73 Fed. Reg. 13368 (March 12, 2008).  The final rule revised the FHWA section 4(f) regulations, removing 23 C.F.R. § 771.135 and replacing it with 23 C.F.R. §774.3. 73 Fed. Reg. 13368, 13395.  Courts have cited to the newer regulations even when evaluating decisions, such as this one, where the decision making process occurred prior to the promulgation of the clarified regulations, because the new regulations are substantially the same as the old ones.  *See, e.g., River Fields, Inc. v. Peters*, No. 3:08-CV-264-S, 2009 WL 2222901, at *3 n. 8 (W.D. Ky. 2009).

(iii) After reasonable mitigation, it still causes:
     (A) Severe social, economic, or environmental impacts;
     (B) Severe disruption to established communities;
     (C) Severe disproportionate impacts to minority or low-income populations; or
     (D) Severe impacts to environmental resources protected under other Federal statutes;
(iv) It results in additional construction, maintenance, or operational costs of an extraordinary magnitude;
(v) It causes other unique problems or unusual factors; or
(vi) It involves multiple factors in paragraph (3)(i) through (3)(v) of this definition, that while individually minor, cumulatively cause unique problems or impacts of extraordinary magnitude.

23 C.F.R. § 774.17 (2010).

     The record demonstrates that FDOT and FHWA considered a selection of alternatives and properly determined that Corridor 3, the Indian Street Bridge Corridor, was the feasible and prudent alternative as required by section 4(f). FDOT and FHWA considered alternative routes beginning with the March 2001 Corridor Alternatives Report. (AR 370–AR 580.)  As part of this analysis, seven different potential corridors were scored on a matrix that balanced multiple factors, including cost factors, environmental factors, engineering factors, environmental impacts, socioeconomic factors, and the impact on section 4(f) sites. (AR 579.)  It is true, as Plaintiffs contend, that many of these corridors  would have avoided Section 4(f) properties, and that Corridor 3, as finally designed, does not. (AR 502–AR 503.)  However, as discussed in the analysis of alternatives, FDOT and FHWA's decision to consider the other alternatives imprudent was neither arbitrary nor capricious and was specifically set forth in the reasoning in the 2001 Corridor Alternatives Report and in the Analysis of Alternatives in Section 2 of the FEIS.

     Corridor 1 was rejected due to additional construction costs of over  $59 million, which led to a very low score on the evaluation matrix for cost and construction factors. (Corridor

Alternatives Report, Table 2.7.10 Total Estimated Project Cost, at AR 474; Table 4.1.2 Corridor

Evaluation Matrix at AR 579.) Corridor 1 suffered from difficult issues in drainage and

constructability. (AR 579.) In addition, Corridor 1 ranked poorly due to probable impacts to

protected and endangered species, and impacts to the floodplain. (AR 579; *see also* AR 456; AR

517.) "Construction, operation, or maintenance costs of an extraordinary magnitude" and "severe

impacts to environmental resources protected under other federal statutes" are acceptable reasons

to find a project not "prudent and feasible" for 4(f) analysis. 23 C.F.R. § 774.17(3)(iii) (2010). In

addition, even if a factor is "individually minor," cumulative impacts of multiple factors can

cause unique problems sufficient to reject an alternative as imprudent. 23 C.F.R. § 774.17(3)(vi)

(2010). Thus these cumulative concerns were sufficient to permit FDOT and FHWA to reject

Corridor 1.

Corridor 2A was rejected due to significant environmental impacts, including impacts on

wetlands and federally protected species. (AR 579; *see also* AR 517). Corridor 2 also presented

difficulties with drainage and constructability, and impacts to floodplains, as it would have

entailed building on a tidal plain. (AR 456; AR 579.)  Severe impacts to environmental resources

constitute an appropriate basis for rejecting Corridor 2A as imprudent. 23 C.F.R. § 774.17

(3)(iii)(D) (2010).

Corridor 4, enlarging the existing corridor, was found to be an imprudent alternative

because it did not meet the purpose and need of the project, to provide an alternative crossing to

the Palm City Bridge. An alternative that does not meet the purpose and need of the project may

be rejected as imprudent in the 4(f) analysis. *Druid Hills*, 772 F.2d at 715. In addition, Corridor 4

potentially impacted historic properties in Palm City (AR 503), and could potentially impact an

active bird rookery (AR 518). Therefore, Corridor 4 was properly rejected as imprudent.

Corridor 5 would have required use of Pendaris Cove Park, a county park and wetland preserve protected under Section 4(f). (AR 503.) Thus, Corridor 5 was properly rejected as imprudent due to Section 4(f) concerns. *Id.* "An alternate route that also impacts upon parks and historic sites is not an alternative to the use of such property." *Druid Hills*, 772 F.2d at 715.

Corridor 6A was rejected due to a nearly $26 million increase in project costs. (AR 474). Corridor 6A also scored low on the evaluation of socio-economic factors, including community cohesion and public opinion. (AR 579). Corridor 6A also scored very low on traffic service factors such as system linkage, as it would not improve access to the Port St. Lucie area. (AR 454; AR 579.) As improving traffic and access were central to the purpose and need of the project, these factors provide a reasonable basis to reject Corridor 6A as imprudent. Furthermore, the cumulative factors of disruption to established communities, additional construction and maintenance costs, and social and economic impacts are appropriate bases for FDOT and FHWA to reject an alternative as imprudent. 23 C.F.R. § 774.17 (3)(iii)(vi) (2010).

Finally, Corridor 7, similar to Corridor 6, added more than $39 million in construction costs and failed to provide a viable link between Stuart and Palm City. (AR 579; AR 454). Thus, Corridor 7 was also properly rejected as imprudent due to the additional costs and failure of the project to meet the purpose and need. *Druid Hills*, 772 F.2d at 715.

Despite the fact that the 2001 Corridor Alternatives Report initially stated that the proposed project "must avoid impacting" the Kiplinger and Audubon parcels, (AR 502–503.), the final design of the bridge project will result in the bridge crossing over a small portion of the island and the construction of piers on the Kiplinger island instead of around the island fringe,

but no construction will take place on the sites east of the river.[11]  (AR 7455.)  These changes

since 2001 to the project design were made by FDOT, in consultation with the Martin County

Environmentally Sensitive Lands Administrator, in order to preserve the natural resources of the

island.  (AR 7462.)  The alignment alternative for the bridge, Alternative 3B/4B, was selected in

response to a Martin County Parks and Recreation Department request to minimize impacts to

the land-side Kiplinger site boundary and a tidal creek. *Id.* The FDOT evaluated the possibility of

placing the piers off the island itself, which would result in no direct use of Section 4(f) property.

*Id.* Nevertheless, FDOT and Martin County, with input from the United States Environmental

Protection Agency, agreed that it would be less environmentally damaging in the long-term to

place the piers on the island with the FBT bridge than placing the piers in the mangrove fringes

of the island.  *Id.* This minimal use of the land, done in order to preserve the environment and

address environmental concerns, is not enough to demonstrate that building the bridge in

Corridor 3 is an imprudent use of Section 4(f) resources.  "In assessing the importance of

protecting the Section 4(f) property, it is appropriate to consider the relative value of the resource

_____

[11] With respect to the Kiplinger parcel, the Plaintiffs also allege that the overhead crossing of the island portion of the Kiplinger  parcel constitutes a "constructive use" of the 4(f) property. Those allegations are unfounded. Under the regulations, "constructive use occurs when the transportation project does not incorporate land from a Section 4(f) property, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired." 23 C.F.R. § 774.15(a). Substantial impairment occurs only when these features are "substantially diminished." *Id.* However, FDOT and FHWA examined the impacts of the bridge, and reasonably found that the height of the bridge (over 50 feet high), the stipulation that the island will remain accessible by water only, and the distance of the bridge from important rookeries and bird nesting sites resulted in only minimal proximity impacts. (AR 7456.)  The agencies also evaluated the aesthetic impacts, finding that the bridge would give an opportunity for pedestrians and bicyclists to enjoy the aesthetic features of the island without significant impact. *Id.* These minor impacts do not meet the stringent requirement that the features of the 4(f) site be "substantially diminished" in order to find constructive use.

to the preservation purpose of the statute." 23 C.F.R. § 774.17 (2010). The preservation purpose of the statute is furthered by a considered determination, in conjunction with other preservation officials, to use a small amount of 4(f) property to protect environmental resources.

The reasons for initially rejecting the other corridors in the Corridor Report are not invalidated by the later change to Corridor 3. The decision to allow some minimal impact in the Corridor footprint, made after an analysis of the best interests and feasible benefits to the park, is not arbitrary and capricious, and complies with the requirements of Section 4(f)(1).

Plaintiffs next contend that FDOT and FHWA violated Section 4(f)(1) because the No-Build Alternative, the Tunnel Concept alternative, and the Citizens' Alternative were rejected as imprudent in the FEIS.  The Tunnel Concept alternative, building a tunnel underneath the St. Lucie River instead of a bridge crossing, was rejected after an analysis, attached to the Corridor Report as Appendix A, found that the cost of a tunnel was much too high to make the Tunnel Concept a feasible alternative. (AR 605.) Furthermore, problems of disposal of excavated soil and other environmental impacts resulted in an alternative that would not mitigate all environmental concerns, despite the very high cost. (AR 601–604.) FDOT and FHWA were well within their discretion to find that the tunnel alternative, while "feasible," was an imprudent alternative to the Indian Street Bridge.

Plaintiffs also allege that FDOT and FHWA violated Section 4(f)(1) by rejecting the No-Build Alternative and the Citizens' Alternative as imprudent because neither of these options fulfilled the purpose and need of the project.  However, it is well-established that alternatives can be rejected if they fail to fulfill the purpose and need of a project. *Druid Hills*, 772 F.2d at 715; *City of Alexandria, Va. v. Slater*, 198 F.3d 862, 873 (D. C. Cir. 1999) ("[A]n alternative cannot

be a prudent one if it does not satisfy the transportation needs of the project.").  To the extent that Plaintiffs argue that the purpose and need was improper, and therefore it was improper to reject these Alternatives, the Court has rejected the argument as part of the consideration of Plaintiffs' NEPA complaints. The No-Build Alternative does not address the need for additional lanes of traffic across the St. Lucie River. The Plaintiffs have not shown what they would need to show to win under Section 4(f)(1): either that their Citizens' Alternative satisfies the transportation needs of the project, or that they can offer a "prudent" project alternative that does not impact 4(f) properties. *City of Alexandria*, 198 F.3d at 873.

**B.     Harm Minimization**

The next prong of the statutory requirement, Section 4(f)(2), demands that FHWA use all possible planning to minimize harm in a situation where, like here, there are no feasible and prudent alternatives to the use of Section 4(f) property. *Overton Park*, 401 U.S. at 411. Section 5 of the FEIS, the evaluation of Section 4(f) resources, demonstrates that FDOT and FHWA carefully evaluated the impacts of the project to Section 4(f) properties, and determined how to minimize harm on when the impacts were unavoidable. (*See* FEIS, Section 5, Section 4(f) Resources at AR 7421–7466.)

FDOT and FHWA evaluated four potential Section 4(f) sites within the footprint of the Indian Street Bridge corridor. The agencies first determined that the improvements to the Martin Highway roadway would require the acquisition of two 10-12 foot wide strips of land from Hidden Oaks Recreation Complex near Hidden Oaks Middle School. (AR 7422.)  These improvements were requested by school officials in a July 2002 meeting. *Id.*  The improvements would require less than 1% of the Recreation Complex land and do not impair or diminish access

to the park.  *Id.*  FDOT and FHWA then properly examined if there were any alternatives to avoid the use of the land, such as a No-Build Alternative or an alternative that would eliminate the right-turn lanes. (AR 7430.)  However, Defendants determined that the alternatives would not meet the purpose of the project to improve traffic congestion, and that an alternative would demonstrate a lack of responsiveness to the desires of the community and school officials. *Id.* Finally, during the DEIS review period, Defendants determined that the portion of the property in question, which lay outside of the fence surrounding the ballpark, was not maintained for a recreational use and therefore did not implicate Section 4(f). (AR 7431.)  Plaintiffs contentions that other alternatives would have avoided the Hidden Oaks complex are thus without merit.

Similarly, the original design would have impacted the proposed Danforth Park by acquiring a 12 to 24 foot strip of property along Martin Highway and a 12 to 19 foot strip along the east side of Mapp Road, a total acquisition of up to .5 acres of land, which is 2% of the property. (AR 7433.)  FDOT and FHWA worked with local officials at the County Parks and Recreation Department to refine the design and avoid any acquisition within the actual boundaries of the proposed park. *Id.*  Instead, all right-of-way acquisition will be outside the boundary of the property, avoiding wetlands and impacts to the park. *Id.*  Finally, FDOT and FHWA agreed that they would not permit construction staging at the Danforth Park property. (AR 7441.)  Thus, there are no impacts to Section 4(f) property to be minimized.

The Indian Street Bridge Project does impact the 4(f) property of Jock Leighton Park. A strip of land approximately 23 feet wide and 150 feet long, with an area of 0.079 acres, less than 1% of the park, will have to be acquired along the east side of Mapp Road to accommodate a right turn lane. (AR 7442.)  Although the No-Build alternative and other avoidance alternatives were examined, there was not a "feasible and prudent" alternative that did not result in the use of

-32-

this strip of park. *Id*.  FDOT and FHWA also examined alternatives to minimize harm by relocating the proposed corridor, and selected "Concept B," which minimizes the impact to the park by impacting a nearby Post Office property. (AR 7450.)  This alternative reduces the amount of parkland to be acquired from a 23 foot wide strip to a 13.5 foot strip. *Id.*  The agency therefore  reasonably concluded that the acquisition of the right-of-way at Jock Leighton Park was an unavoidable impact, and that measures to minimize harm were evaluated and implemented to the extent possible. (AR 751); *Druid Hills*, 772 F.2d at 716 ("[A] route which does minimize harm can still be rejected if it is infeasible or imprudent.").  The acquisition of this 13.5 foot strip of right-of-way is the feasible and prudent alternative that minimizes harm, which does not violate Section (4)(f).

As discussed above, FDOT and FHWA used all possible planning to minimize the harm to Kiplinger Island. The original design called for the bridge to cross over the island, but not to touch the island parcel.  However, this was rejected when it was determined that placing the piers on the island itself would be less environmentally damaging than placing the piers in the mangroves on the edge of the island. (AR 7462, 7463.)  In addition, while the portion of the bridge crossing over the island does not rise to the level of a constructive use of the parcel, FDOT worked with the Martin County Parks and Recreation Department, the Martin County Environmentally Sensitive Lands Administrator, the Martin County Audubon Society, the United States Environmental Protection Agency, the United States Army Corps of Engineers, and the United States Fish and Wildlife Service to minimize the effect of the bridge spanning over the parcel. (AR7463–7465).  The eventual solution places the bridge crossing at one of the narrowest points of the island in order to minimize impacts, and places the bridge height at a minimum of 50 feet over the island in order to minimize shading and other potential impact to the island. (AR

7465.)  FDOT had committed to removing exotics on the island within the bridge path, and to continually coordinating with other agencies to minimize impacts. (AR 7466.)  Thus, the agency included all possible options to minimize harm to the Kiplinger island site, as required by Section 4(f).

Finally, the decision to use the Indian Street Corridor was not arbitrary, capricious, or an abuse of discretion under Section 4(f), any more than it was arbitrary and capricious under NEPA.  This record demonstrates that FDOT and FHWA carefully considered all relevant factors and made no clear error in judgment. *See Overton Park*, 401 U.S. 416. The record as a whole demonstrates a well considered and statutorily permissible decision. It is not within the role of the Court to second guess FDOT and FHWA when they have fully demonstrated a reasonable and permissible basis for the final decision, and the Court will not do so here.  Accordingly, it is hereby:

**ORDERED and ADJUDGED** that

1. Defendants' Motion for Summary Judgment **(D.E. 78)** is GRANTED. Plaintiffs' Motion for Summary Judgment **(D.E. 82)** is DENIED and Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction **(D.E. 121)** is DENIED AS MOOT.

2. This case is CLOSED, and all pending motions are DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, April 30, 2010.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Lynch
All Counsel of Record